OPINION.
{¶ 1} Defendant-appellant Bertha Johnson appeals from her conviction and sentence on five counts of Passing a Bad Check, one count of Theft, and one count of Grand Theft. Johnson contends that her convictions are not supported by the evidence, and are against the manifest weight of the evidence. She also contends that certain testimony by the mother of a state's witness was improperly admitted as part of the state's rebuttal.
 {¶ 2} We conclude that the evidence in the record supports Johnson's convictions on all counts, and that her convictions are not against the manifest weight of the evidence. We further conclude that the trial court properly permitted testimony by the mother of a State's witness, as part of the State's rebuttal. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Between August 15 and August 20, 2001, Jessica Kersey, Johnson's son's girlfriend, and the mother of Johnson's grandson, cashed eleven checks drawn on Johnson's account at Community National Bank. The checks varied in amount from $625 to $768. They were cashed at various branches of the Wright-Pat Credit Union. The total amount of all of these checks exceeded $8,000.
 {¶ 4} As of July 14, 2001, Johnson's balance in her checking account was $112.24. At no time during this period, or later, was there enough money in her account to have paid any of the checks Kersey cashed.
 {¶ 5} When Bryan Mellon, a fraud investigator for Wright Pat Credit Union, called Kersey to inquire about the checks she had cashed, Kersey told them that Johnson had given her all of the eleven checks to cash. When Mellon called Johnson, Johnson denied knowing Kersey, and denied writing the checks. Later, when Johnson was being interviewed by Centerville Police Detective Daniel Osterfeld, after having been arrested, she admitted that she had written each of the eleven checks cashed by Kersey. She also admitted that she knew there were insufficient funds in her account when she wrote the checks.
 {¶ 6} Community National Bank notified Johnson each time one of her checks was returned for insufficient funds. This notice was provided both by letter to Johnson's residential address, and by telephone. Amy Jones, a representative of the bank, testified that it was her practice to contact a customer under these circumstances by telephone, either at home, or at work, and, if the customer was not there to take the call, to leave a recorded message at each place.
 {¶ 7} Johnson's account at Community National Bank was closed in early September, 2001, and Johnson was notified of this fact.
 {¶ 8} On September 19, 20 and 21, 2001, Lidia Vella, another of Johnson's son's girlfriends, cashed a check drawn on Johnson's Community National Bank account. The first two of these were in the amount of $675, and were cashed by Vella at Liberty Savings Bank. Vella testified that Johnson asked her to cash these checks, saying that Johnson could not cash the checks herself, because she no longer had identification. Vella testified that she saw Johnson write Vella's name, as the payee, on the first of these checks.
 {¶ 9} The third of the checks payable to Vella was in the amount of $675. Vella testified that this check could not be cashed until after she had finished working at a day-care center, which was after bank hours. Vella testified that she and Johnson went into the lobby of the Liberty Savings Bank, which was open, and used an Automatic Teller Machine to deposit the third check into Vella's account. Vella testified that Johnson was present with her, and assisted her in completing the transaction on the Automatic Teller Machine.
 {¶ 10} Vella testified that she later was asked to cash a fourth check, but when she presented it to a teller, she was told that the account had been closed. Vella then returned to Johnson's house, and told her what the bank had said. Johnson took the check from Vella and destroyed it.
 {¶ 11} All of three checks Vella cashed were returned to her bank as unpaid because the account had been closed. Michael Voice, a fraud investigator for Liberty Savings Bank, contacted Johnson. Johnson told Voice that she knew her checking account had recently been closed, but claimed that she had destroyed all her unused checks. Johnson acknowledged knowing Vella, but denied ever writing Vella a check.
 {¶ 12} Detective Osterfeld attempted numerous times to make an appointment to talk with Johnson, but was unsuccessful. Finally, he obtained a warrant for her arrest, and arrested her. After being advised of her rights, Johnson acknowledged having given all fourteen checks to Kersey and Vella, respectively, for cashing. Although Vella testified that she gave all of the proceeds from the checks to Johnson, and Kersey told Osterfeld and Mellon that she had given most of the proceeds of the checks she cashed to Johnson, Johnson told Osterfeld that Kersey and Vella had purchased cocaine for Johnson, using the proceeds from the checks.
 {¶ 13} At trial, Johnson recanted her confession. She acknowledged having admitted to Osterfeld that she wrote the checks, but asserted that she just did that in order to protect Vella and Kersey. Kersey was called by the State. Kersey acknowledged having given a contrary statement to Osterfeld, but testified, at trial, that Vella gave her the eleven checks totaling over $8,000, and that she just assumed that Johnson was providing this in the form of financial assistance, without bothering to discuss the matter with Johnson.
 {¶ 14} The essence of Johnson's testimony was that someone, presumably Vella, had stolen the checks and forged Johnson's name.
 {¶ 15} In its rebuttal case, the State called Dona Vella, Lidia Vella's mother. Over objection, Dona Vella testified that her daughter had some mental deficits that would have made it impossible for her to perform a number of the steps that would have been required to have carried into execution the criminal schemes suggested by Johnson's testimony. Johnson's objection was upon the ground that this testimony was outside the proper scope of rebuttal testimony.
 {¶ 16} The jury found Johnson guilty on all charges, judgments of conviction were entered, and Johnson was sentenced accordingly. From her conviction and sentence, Johnson appeals.
 II {¶ 17} Johnson's First Assignment of Error is as follows:
 {¶ 18} "The verdict of the jury was against the manifest weight of the evidence and fails to meet the sufficiency of evidence standard."
 {¶ 19} Johnson's contention that her convictions are not supported by the evidence is easily dealt with. Johnson's confession to Detective Osterfeld, corroborated by the checks themselves, would support her conviction on all counts. Although Johnson recanted her confession at trial, the jury was entitled to disbelieve her.
 {¶ 20} Johnson cites State v. Thompkins (1997), 78 Ohio St.3d 380, for the proposition that when the weight of the evidence is challenged, an appellate court sits as a "thirteen juror" and may register its disagreement with the determinations of the fact-finder. The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
 {¶ 21} We have reviewed the entire transcript of testimony, and we conclude that the jury did not lose its way. Johnson confessed to Detective Osterfeld. At trial, Johnson did not deny having confessed passing these checks, knowing that they were bad, to Detective Osterfeld, but claimed that she had falsely confessed the offense, because she was attempting to protect Kersey and Vella. Interestingly, her statement to Osterfeld "protecting" Kersey and Vella included the assertion that her arrangement with Kersey and Vella was for the women to use the proceeds from the checks to buy cocaine for Johnson. We can understand why the jury might have tended to discredit Johnson's testimony that she only made this statement in order to protect Kersey and Vella.
 {¶ 22} In her testimony, Johnson dealt with her statements to Mellon and to Voice, the bank investigators, simply by denying that she had talked to either investigator. In view of the testimony of both investigators that they talked to a woman at Johnson's phone number, who appeared to have knowledge of the account, we can understand why the jury might have discredited this portion of Johnson's testimony.
 {¶ 23} Johnson also had the problem of accounting for the fact that she had not reacted to the notices from her bank of the bounced checks. She explained to the jury that she does not get her own mail from her mailbox, because she works two shifts, but has her three adult sons retrieve the mail from the mailbox, and put it on a table inside her house, where she will see it. She testified that her three sons are not reliable in this regard, so that she often does not get her mail.
 {¶ 24} Elsewhere in her testimony, she had to deal with the fact that she had never bothered to reconcile her bank statements. She told the jury that she never bothers to check her bank statement, in part because she trusts the bank to be accurate, and in part because her sons make deposits for her, and she is certain that they faithfully make the deposits. In view of the fact that she had previously testified that she could not even trust her sons to bring in the mail from her mailbox, we can appreciate that the jury might have found this portion of her testimony unworthy of belief.
 {¶ 25} In short, we find it unremarkable that the jury decided that Johnson's testimony was not worthy of belief. In our view, the jury did not lose its way, and Johnson's conviction is not against the manifest weight of the evidence.
 {¶ 26} Johnson's First Assignment of Error is overruled.
 III {¶ 27} Johnson's Second Assignment of Error is as follows:
 {¶ 28} "The trial court erred in permitting rebuttal evidence to be presented to the jury which went beyond the scope of the appellant's case in chief and cross-examination."
 {¶ 29} Johnson cites State v. Hohman (1991), 81 Ohio App.3d 80, for the proposition that rebuttal testimony is properly offered to refute evidence offered by the adversary. Johnson contends that the rebuttal testimony of Dona Vella, Lidia Vella's mother, concerning her daughter's limited mental acuity, went beyond the scope of Johnson's case in chief. This testimony included the fact that Lidia Vella is limited in her ability to write in cursive (all of the fourteen bad checks were written in cursive); that, because of Lidia Vella's dyslexia, she would not have been able to write dollar amounts consistently, but would instead have transposed numbers; and that even if Lidia Vella had been able to write out the amount of a check in numbers, she would never have been able consistently to write out the amount in words.
 {¶ 30} In our view, this was proper rebuttal evidence. It was clearly Johnson's contention, in her defense, that Lidia Vella had stolen her checks, forged her signature, and given some checks to Kersey to cash, while cashing three checks herself. Lidia's mother's testimony was elicited to rebut this factual proposition.
 {¶ 31} As Johnson notes in her brief, this testimony was offered to demonstrate that Lidia Vella could not have forged the checks. Thus, Dona Vella's testimony was offered to rebut Johnson's assertion, in her case in chief, that Lidia Vella stole the checks and forged them. This is proper rebuttal evidence. Johnson's Second Assignment of Error is overruled.
 IV {¶ 32} Both of Johnson's assignments of error having been overruled, the judgment of the trial court is Affirmed.
GRADY and YOUNG, JJ., concur.